Good morning and may it please the court. I am Michael Brown and I'm here on behalf of appellants where we're referred to as retirees. The district court, first I'd like to address the district court's dismissal of our claim related to the retiree medical grant benefit. The district court dismissed this claim holding that under this court's 2012 ruling in the first Harris appeal the intent to prove an implied term promising that this benefit would vest upon retirement. Are we talking now about the grant? We need to come up with some phrases because they're there I think you'd call them the grant benefit and the subsidy benefit? Those are two separate benefits. The grant benefit is a monthly stipend. I know which one are we talking about now? That's one we're talking about now. Just three weeks after the district court's decision this court handed down its decision in the Sonoma County case in which this court explicitly rejected the reasoning that Judge Guilford had used to dismiss our claims. I'll refer to that Sonoma County decision as Sonoma 2. In Sonoma 2 this court held that retirees did not need to plead and express promise that the benefit vested and it held that retirees could rely on extrinsic evidence to justify their application. So assuming that we agree with you then what? Do we then go ahead and decide ourselves on first of all there are two complaints there's there's which complaint are we doing this one? The third amendment complaint or the proposed fourth amendment complaint? The second amendment complaint is where this the claims related to this benefit froze and it was simply replicated in the third amendment complaint. And it's not in the fourth amendment complaint the proposed fourth amendment complaint doesn't matter? Correct. And what then what? So then we do it ourselves because it's just on the pleadings and we decide whether you've alleged enough essentially? Correct. With the benefit of the Sonoma 2 guidance and under Sonoma 2 we're required to do four things basically to state a claim. We have to plead that the county entered into a contract and there's no doubt that these MOUs are contracts. We have to plead that the contract provided for a these contracts provided for the grant benefit and they're express terms. We have to plead that the contract included an implied term the grant benefit vested. We did that. In fact we pleaded it with evidence that the Sonoma 2 court specifically blessed in its ruling. Long-standing course of dealing, testimony from former board officials, that retirement health benefits are always considered vested upon retirement even though they are considered negotiable during retirement. During active employment. And the final requirement was that the MOUs were adopted by ordinance or resolution and in this case the county has admitted but I'm sorry not in this case in the in the coordinated case the REOG case the county has admitted that these MOUs on which we rely here were adopted by resolution and it hasn't argued otherwise so that fourth requirement we our claim should have survived. I've also noted I didn't submit a 28-J letter but Judge Wilkin has just recently applied Sonoma 2 in an unpublished decision in which she allowed the claims based on MOU promises to go forward under Sonoma 2. Which case was that? Can I give you a citation for that? Just tell me the name of it. But that's Sonoma, that's the Sonoma County Association of Retired Employees versus County of Sonoma. I thought you were talking about Judge Wilkin's case. I believe that Judge Wilkin's case is the... The Sonoma County case is the one that was in the Ninth Circuit. Right, I'm sorry, what I'm saying is that Judge Wilkin has now applied the Ninth Circuit's guidance in the district court. Oh, in the Sonoma case. I see. In an unpublished... Correct. Yeah, so you're going to give us... Yes, it's... We can find it. Okay, so in terms of... Wait a second, what is the name of that case? You're supposed to, you know, give us a little... We've got a little chip over there you have to fill out. Would you like me to say it on the record now? I have the citation, if that would help, or I could... Okay. Could he also file a 20HA, so... I could just do that. It's 2014, Westlaw, 108313. I'll file a 20HA as well. I'm sorry, Judge Bresland, did you have... Well, I just wanted to go over what you think the evidence...quickly, what you think the relevant evidence is here. You said longstanding dealings, board testimony. To me, the most interesting part of this was the particular features of this grant as to which there was specific funding and as to which the employees were essentially paying for themselves and also as to which there was a refund mechanism. Now, is that in the complaint? Does it matter if it's in the complaint? It is in the complaint. It is. And it's in our briefing as well. Okay. We're operating on the complaint now. Is it in the complaint? I understand. I understand. It is in the complaint. You're talking now about, what, that $150 million fund? That's in the complaint as well. What I think Judge Bresland was referring to was the fact that employees, when they were active employees, paid 1% of their salary. Oh, yeah. And that is in the complaint as well. There's also the county used this grant program in 1993 to induce people to retire. They wanted people to retire because they had too many employees. And we allege that if you give somebody a benefit to induce them to retire, you don't at the same time hold the power to take it away the day after they retire. Okay. As to the other issue, I don't remember what you're calling it, subsidy issue or whatever. Yes. First of all, we have a case with priority that is dealing with the contract issue. Yes. You have some dispute between you as to whether you've preserved that issue or not. I don't know if it's worth worrying about at this point. The difference between the two cases is that they're only asking for prospective relief and you're asking for retroactive relief. Is that the difference? Correct, because we believe that the association, REAC, could not seek damages relief. So this, we brought a class action. And couldn't seek damages because it wasn't brought as a class action. Correct. But this case also has a claim that is not, the grant claim is not in the REAC case. It's only the- I understand. Okay. I understand. Okay. All right. So now there's the FEHA claim, which- Yes. Okay. Could you tell me, first of all, whether FEHA and AGEA differ in any way that's pertinent to this claim? I don't believe so. You don't. You just happen to bring it as a FEHA claim. The authorities we are relying on are federal authorities because there's a lack of California authorities. But I believe there are Ninth Circuit cases that clearly say that there's a language- So the reason you brought it as a FEHA claim and not an AGEA claim was just because? Correct. Okay. Right. It was a question of timing. I'll put it that way. Okay. We believe that the district court's ruling on the county's motion on the FEHA claim required a straightforward application. What I think Judge Berzon referred to earlier today is a literalist approach. The statute says that an employer may not discriminate against any person, and we know retirees are persons under the statute, with respect to compensation terms or conditions of employment. And we know that- And nobody's contesting either of those things now, even though they did before. I think that's correct. Okay. And because of age. And I guess that's what is being contested here, is that the county argues that it didn't do this because of age. It did this because of retirement status. And it's true that the resolution doesn't say age on it. The board didn't pass a resolution that says age. But the county has admitted in sworn declarations- Well, in fact, I mean, the way that this case differs from Manhart, and from that species of cases, is that the line draws- What case did you define? Manhart, the sex discrimination. That's one time I was affirmed by the Supreme Court. And I wrote briefs in Manhart. I know it was. Go ahead. So, the- Is that there- I mean, the line drawn was explicitly on sex, right? Explicitly on- It was- In other words, a lot of the argument was, well, this isn't really disparate treatment because it's really based on lifespan. And the answer was, oh, no, it isn't based on lifespan. It's based on sex, gender, right? But in this instance, if somebody isn't retired and is 90 years old, this doesn't apply to them, right? That's correct. So, it's not an explicitly age-based line. It is not. And, therefore, you can't just go from Manhart to this. No, I agree. And I think the bridge from Manhart to this is Kentucky retirement systems and Hayes and Paper. I'm not sure that Kentucky retirement system doesn't cut against you, but let me hear why you think not. I believe that the basic premise of Kentucky retirement systems, the starting point is age discrimination. An employer cannot discriminate against a retiree based on the assumption the retiree is older or less healthy than an active employee. And an individual retiree, even though that's true in the aggregate. Correct. And that was one of the concepts that underlay the Manhart case. The discrimination by proxy? No. I'm sorry. No, but you've got to treat. The actuarial case on women employees. Yes, the true stereotypes, there's not a truth defense under FEHA. If you're discriminating and you can show that you're discriminating based on a rational statistical analysis, that doesn't make it lawful. The Kentucky case, Hayes and I found a bunch of other cases that weren't in your briefs. All are dealing with active employees around their retirement, but they're active at the time that they're complaining about. Is that right? Is there any case, which case or cases actually deal with retirees, quad retirees once they're retired? I think you're correct. In Hayes, the employment action was while the man was still. And in Kentucky, too, because the people who were complaining were complaining that they were retirement eligible, but they were still working. And they weren't getting the credit that other people who were. I would have to check again, but I believe in Kentucky some of the plaintiffs might have been people who were already retired but were seeking more years of credit. Well, back from the period that they were working, but they weren't claiming anything while retired. That's correct.  I mean, that's the other place I have a real problem with your arguments. Because, I mean, I guess I need to ask you first is suppose they didn't change this. Suppose their original plan as negotiated was active employees get X health plan and retirees get Y health plan, just different health plan. Is that okay? It would depend on the motive.  We don't want to spend more money for them than we're spending for the others. Let's say even they're paying for it. So we're going to have a different health plan for them. I think it would be analytically it would be a similar case. I think that the... So what if they said we don't want to have any health benefits for retirees because they're so old and expensive? I think that would give rise to a claim that they were acting on the basis of age. You mean if they denied all health benefits to retirees? I'm not saying that they're too old. Retirees are too old. We're not going to give them health benefits. You think they could state a claim then? Really? So an employer can't determine what a retirement program is is what you're saying? I think it's moving away from the hypothetical then. I think that it is different in this case when employees are... Well, but I'm not sure it is because it seems to me there is little difference, if any significant difference between drafting a retirement program that has no health care benefits and drafting one that separates retirees in one group and active employees to another. I don't see the difference. And if you tell me that there is a claim in the former and in the latter, I would like to know why there is a claim in the former. What I would point to is the statutory language. I think that you begin with the statute. If the employer is targeting persons with respect to... Well, but they aren't affecting terms, conditions, or privileges of employment. They're saying this is what you get if you retire. This is what you get if you're active. I think there are cases that say that terms, conditions, or privileges of employment includes the retirement health benefits of retirees. Yes, but if they are not... With regard to active employees, right, they're not distinguishing among active employees on the basis of their age, right? They're saying at whatever age you are now, when you retire, either A, don't get any health benefits, or B, you get half the health benefits, or C, you get the same health benefits, right? Whatever age you are now. And you can work as long as you want. But once you stop working, you're a retiree, and then you're going to get either A, B, or C, whichever one they happen to choose. And I'm having the same problem that Judge Murphy is. How can it be that if their conclusion is no health benefits because we can't afford it because retirees are expensive, why are they expensive? Well, yeah, you know why they're expensive, because they're on the average older and on the average sicker. That's true. Nobody is saying it isn't true. And the question is, does the statute prescribe that? I think, I understand your hypothetical in that case that you're asking whether the statute would apply to active employees or people who are retired. Does the statute, is there any case in which the statute has been said to apply to retirees, qua-retirees, while they're retired, and requiring them to be treated the same as active employees if the reason for not doing, I mean, you couldn't say we're going to pay, you have to pay retirees for not working the same amount that you pay active employees. But your reason there wouldn't be age-based. Well. It would be based on the fact they're not working. Right, and this is in part based on the fact that they're not working, they're retirees. So we're going to now look at this different group, the group of people who aren't working, and we're going to decide what benefits to give them. Well, I think if the employer's motivation was that these folks aren't working, they could not give them any benefits, and that wouldn't implicate age. That wouldn't implicate age. Therefore, they need not give them health benefits. Not under the age discrimination statute. All right, and so we're just doing a little bit of that now, not giving them health benefits by putting them in this different pool. We are distinguishing the type of health benefits. If we can deny them, then we can give them some, but not the whole thing, right? No, I'm sorry. They're getting a break here. I'm sorry if I misspoke. They couldn't, in the hypothetical you're mentioning, they couldn't give them nothing based on age. That's a bad double negative. They are required then, what you're saying, if they have in their mind that they know that retirees cost more under health programs, they are prohibited from declining to provide health benefits in their retirement plan under the state age discrimination act. That's what you're saying, aren't you? So you're essentially saying if one employer says, look, I'm not going to pay employees health benefits, retirees, because they're retired, and the other one says, well, you know, maybe I'll consider it. Let me look into it. And he looks into it and he says, oh, this is going to cost way too much money because their particular demographics are such that it's really expensive, so I'm not going to do it. So you're going to treat those two people differently. Yeah, but you have here a situation where you had the retirement plan that didn't draw any distinction, and these folks, some of them started out when they were young, and you had other people that were older, and they all put the same amount in the kitty, right? And so the deal was that we were to be treated as one group, we all put the same amount of money in, and we get the benefits that are equal. And then time goes by and they figure out, well, let's take the older ones and put them in this group, or the retirees, put them in this group, and the people who are not retired, they're probably going to be younger, we'll put them in another group. And that's where the discrimination comes in. Well, that's why, contrary to the hypotheticals, that's why in this case there were actual people receiving actual benefits who were targeted and told to be targeted. That's what I'm talking about. That's what we're dealing with here. But in fact the active employees and the retirees were always treated differently. That's another problem. The active employees and the retirees were always treated differently because the active employees had their health benefits largely paid for, and the retirees mainly paid for themselves. That's correct. Why isn't that age discrimination? There's no evidence that that decision was based on age. There's no evidence it was based on age. Then as an employer, because I can completely cut off all health care benefits, if I can do that, I can just say in our retirement plan there's no health care benefits, can't I? If you do that for reasons other than the age of the people you're cutting off. Let me ask you this. Isn't it true that in order to prevail on this, you must equate the knowledge of consequences of splitting the pool, you must equate knowledge of the consequences with intent to discriminate, right? I think intent to discriminate is proven by statements that we did this because of age. But doesn't that mean that you are equating knowledge of the consequences with intent to discriminate? I suppose it does, yes. Yes, those considerations went into the mix. In fact, it was the largest consideration in the mix. Let me ask you this. In looking at the Fourth Amendment complaint, which is in the record, doesn't the Fourth Amendment complaint effectively set out every fact that you could establish for discrimination? Well, we haven't had discovery, but I think that's correct. We could find more evidence to prove that they... But then you'd have to find a really behavioral type evidence in order to do that, in order to have anything more than you already have, right? And then there's somebody saying, we really want to hurt these people because they're old. There's nothing like that. And you don't expect anything like that. So essentially you have everything in your Fourth Amendment complaint, don't you? That's correct. And that's one of the reasons why too late I asked Judge Gelford to just treat it as a summary judgment. I understand. But you should feel better that I read your Fourth Amendment complaint. I do feel better. I'm way out of time. If I could maybe have a minute. Thank you. It's very, I mean, it's fascinating, actually. I was going to say good morning, but it's good afternoon. Art Hartinger, Maine Police, La Corte. Can I ask you one question right off the chute? Sure. Did you ever, I noticed nobody ever filed a motion to certify to the California Supreme Court. Not, well, in the companion case, the first question. I understand that. But you didn't in this case. And I'm focusing more on the age discrimination. Correct. No one filed that motion, to my knowledge. Nobody still has asked you. We could do it anyway. We could do it if we wanted to. I think we could do it. And, in fact, if the court was inclined to think that there was some ambiguity under California law, because the court, of course, is bound to try to figure out what the Supreme Court would do in this instance, that. Well, the reason why I ask is it's so integral to California law versus the ADA. Right. Surely. All right. State law question. I don't know if they ever want to hear about this case again, but. Well, I think my clients will kill me. I mean, if the case keeps going on and on, because, obviously, we're interested in having it resolved. There's a lot of. He'll be an old man and you'll get a reduced benefit. Well, no, he'll get an increased benefit because it's gone on so long. No comment on that. But, no, there's a lot of, you know, there are a lot of contracts at issue in this case. I mean, one of the things I was going to start out to say is that, remember, this case, the contract that is being challenged here with respect to the grant issue, is the contract that was negotiated by the largest county employees union. They are the ones who negotiated the first agreement, and they're the ones who negotiated the reform and restructuring. That affects thousands of folks. Everybody signed on. It's telling that not one labor union has joined this lawsuit. They understood these issues with respect to the grant. Well, they have their own problems. But the question is, why isn't the current complaint with regard to the grant benefit sufficient? Well, I start with what this panel said in its instructions. It wasn't this panel, actually, but go ahead. I misspoke. Judge Pregerson. I'm an outlier. But the instructions were. And I was not in either. Go ahead. The retirees have failed to plead facts that suggest that the county promised in the MOUs or otherwise to maintain the grant. That was before the REAC case, is that right, out of the California Supreme Court? No. Actually, when this decision was pending, the REAC case came out, and the court asked for comment on the REAC case. And we submitted our respective views on it, and so we each had an opportunity to argue on the impact. So what are you arguing? A law of the case argument? I mean, suppose if we didn't say that, wouldn't Sonoma County make clear that there is a viable, and the California Supreme Court REAC case, that there is a case that depends on extrinsic evidence with regard to the implied terms of a MOU. If there is an MOU, and there is a board, and there is a benefit, and there is a board resolution, the precise terms can be implied based on extrinsic evidence. Is that not what Sonoma County says? Well, and that's what REAC said. This court applied REAC. It applied REAC when it looked at. Remember, one of the things that is important to remember for this panel is. See, you're arguing just the law of the case. I just want to be clear that you're not arguing that if we started from scratch under Sonoma and REAC, we would come to that conclusion. You're just arguing that that's what we said. Right. Right. This court said, and when Judge Guilford received the. . . Well, obviously Sonoma County didn't think that's what we said. Well, Sonoma County had its own. . . It's in many respects very similar, and let me just say again. . . When the court said the 9394 MOU was insufficient, we agree with Judge Guilford. We agree with the district court that there were insufficient facts pleaded in that complaint to support the cause of action. Go back and plead more facts. Go back and look for other MOUs. What happened here is that they took the same MOU, the exact same MOU, the 9394 MOU. You had the same allegations in front of you, which included extrinsic evidence. And so there's really very little, if anything, that's different now. It's the same. And that's what Judge Guilford had to deal with. And so I think you have to look again at what the Ninth Circuit said before. It's not inconsistent with what. . . Well, then why were we sending it back to file an amended complaint? Because you wanted to give the court thought that in order to be fair, there should be an opportunity, as counsel asked for, to look for other resolutions, look for other MOUs that would contain the requisite degree of language pointed to. . . But we know from Sonoma County that you don't need language. Oh, no, no. That's not. . . I don't think that's a correct reading of Sonoma County, Your Honor. I mean, Sonoma County followed the REOC case. Sonoma County, remember, it still says. . . And you know from REOC that you don't need language. It was perfectly clear about that. That's. . . I very much disagree with you on that, Your Honor, respectfully. I would say Sonoma County, remember, you start with Government Code Section 25300, which says that you need. . . that that's the protection that a county has. Well, then what does it mean to have an implied term based on extrinsic evidence if it has to be expressed? Because there has to be some connection to an expressed language. Remember, in REOC. . . That's not implied. That's interpretation. Let me just say, remember, in REOC, the counsel got up and the Supreme Court asked, are you. . . you're not claiming an implied, in fact, contract that is not tethered to. . . No, there's a contract here. Right, of course. And there's an MOU, and the MOU says certain things. Right. And the question is, what are the terms of that certain thing? Right. The question is, do you have to have expressed language on those terms? You're saying yes. There has to be some connection, obviously. You can't have something that is so. . . Well, there is some connection. I mean, we know that there was this $150 million funding. We know that there was the 1 percent funding. We know that there's a refund mechanism. We know that it existed for a certain number of years. So there's some connection. Well, the issue is, is where in the language is there. . . But then you're saying that you need language. Well, I believe that you need to have a connection to the. . . Extrinsically, there needs to be some connection to language under 25-300. . . Meaning that you need to be interpreting expressed language. Right. Well, then that's not implied. That's expressed. Well, the term is implied. How is it implied? If it says X and you are interpreting X, you're not implying anything. You're just interpreting the language that's there. Okay. You're interpreting the obligation. You're interpreting the obligation to provide some compensation that is required to be under a resolution or ordinance under Government Code Section 25-300. The contractual language alleged in this case. . . Right. Does not. . . This is from REAC Supreme Court. Does not necessarily depend on whether there is expressed language in his statute or in his granting REAC members the right to a singly unified insurance pool. The parties here have entered into valid bilateral contracts governing compensation. Whether those contracts establish an implied right to a singly unified pool cannot be answered by resort to the language alone is what I read it to be saying. The party may be bound by an implied contract where the relationship is governed by contract or by implied terms of a written contract as long as there is no statutory prohibition. And that they go on to say that as long as there is an adoption of the MOU, there is no statutory prohibition. Then I believe the court goes on to say there is a prohibition, there is a restriction. It's Government Code Section 25-300. And that's where you start with a resolution or ordinance. And then the court gets into proceed cautiously. . . That matters of compensation must be addressed by resolution does not necessarily bar a recognition of implied terms of consortium compensation. Under California law, contractual rights may be implied from legislative enactments and limited circumstances as described further below. Which they then go on to do. So I just think you're not in very good shape. So I think if you go on to look at what the burden is, because remember you had my client and then you also had the lead of California cities and others saying, hey, do you mean . . . How is the entity going to be protected from being blindsided by these financial obligations that we were not aware of because we thought we had a protection. Remember we went into this thinking they had to be expressed. That was the protection. And the court said there has to be language or circumstances accompanying the legislation that must clearly evince a legislative intent. Yeah. Circumstances account. Circumstances count. There's no question. Circumstances count. Well, let me ask you something. It's your position that, as I understand your position, it's that there was only a contract from year to year and any year, including say the year after this contract was entered into, you could have negotiated it away and gotten rid of this benefit. That's your position? That's correct, Your Honor. All right. So there was $150 million put in to fund this and you just could have taken it, walked away, and never funded it again. That's your position? That's what the plan says. Remember, the plan document. The plan document is something that you wrote by yourself. It's not the MOU. But the MOU specifically and expressly referenced the plan document. If you read the document side by side, there's no way you can separate those reasonably. There's absolutely no way. Because if you look at the contract that they've attacked. So, in other words, the union just gave you $150 million and said, here, just take it. That's not a circumstance that at least makes that unlikely? I think you cannot, again, you go back to the implication of the suspension of legislative control must be unmistakable. And how can you take it? My difficulty with this case is that it seems unmistakable that you didn't mean that it could be eliminated whenever you felt like it. So then the question is, how long does that go on for? But unmistakably, you couldn't have eliminated it the next year. That's what the plan, you know, there's some question about the ambiguity of the English language, as the court has indicated. This plan says, this benefit program shall create no vested rights. That is not ambiguous. And we know as a matter of law that you cannot have an implied term that contradicts an expressed term. That's a fundamental point of law. And you cannot take these. Was the plan adopted? What did the county do with $150 million? Well, I don't know that we, that's been an allegation that there's $150 million. Well, I'm just asking you. Right, right. The county was going broke then. Weren't they having big financial problems? Needed money desperately because someone who was an administrator made some really bad investments, and they were ready to go into bankruptcy, and the union bailed them out. Well, I don't know. To some extent. You know, that's a lot of money, $150 million. It was in those days. Today it's, you know, it was. The Orange County Employees Association should be applauded for coming to the table and helping us solve a $1.4 billion unfunded liability to make this plan viable. This was not about, this was about saving the plan. Do you want to discuss the fee-hat claim? Yes. I do need to, can I address one point, though, Your Honor, first? Sure. Because there's the issue of the 1% funding, and this is something that I discovered in the last 48 hours, and it's that the record, to my surprise, is incomplete. When they attached the 9394 MOU, that is, the plaintiffs stopped at a certain page, and they didn't include the page which indicates very clearly on page 96 that the county paid the 1%. In other words, 1% was funded by the county, and it's in the MOU, and I'm embarrassed to say that I need to ask for leave of court to file a request for judicial notice so you have a complete MOU. What difference does that make? Well, to the extent that the court believes that the employees are contributing money and therefore... I thought they were also contributing 1%. This is the 1% issue. You're saying only the county is contributing the 1%? Then why are they getting the money back when they leave? That's the way the plan was written. That's the deal. That the county is paying the 1%, not the employees. At the time that the MOU was adopted, the language in the MOU says, effective on when the retiring medical plan goes into effect, all classes get a 1% increase. It's specifically tied to the retiring medical plan. Oh, I see. They're getting 1%. I see what you're saying. Right. So the court raised that, so I'm just simply saying that to the extent that the court believes that's a critical issue, they've attached an incomplete MOU, and I would like the opportunity to amend the record through a supplemental request. Well, it's not the record, because we don't have a record, right? We only have a complaint. Well, you have those things that you can take judicial notice of. You're right. I'm using record loosely. So, with respect to the Feehawk claim... All right. I'm sorry. Well, you're going there now. Help me with this. I looked at your brief, and if I were to characterize it overall, you're saying that the California age discrimination case doesn't apply because it doesn't discriminate on the basis of terms, conditions, or privileges of employment. And I know you don't want me to characterize it that way because of California jurisprudence. So help me out, because that's the way I see your brief. Well, I think it's beyond that, Your Honor, because I think what we would say, the point we were making is... I am correct. You don't want me to look at it that way, right? You're not really saying that these are not terms, conditions, or privileges of employment. You would be happy for me to look at it that way, but you don't think it's going to work. You don't want me to look at it that way, right? That's correct, Your Honor. All right. But what I would say, though, and as we made a point in the brief of saying, is that, again, you have to try to get into what the California legislature intended to prohibit here. And you're in this realm of retiree benefits, where there have been a number of exceptions made with respect to differences in the benefit packages. And not this one, right? Not the... That's actually inaccurate. The Orange County Employees Association case very clearly said, you don't have to pay the same benefits to retirees as you do to actives. And that was litigated against Orange County, and it came out in 1991. It is one of the circumstances, actually, that suggests why the county was so strong about a no vested rights provision in the plan document, because that was a vested rights challenge. And that was an age discrimination case. No, it was not an age discrimination case. But remember, you're looking at these statutory frameworks, including the bridge benefit, where you can reduce benefits when you turn age 65, including the health and safety code, including the education code. Well, why do they need the bridge benefit provision if there wasn't some assumption of having to have some similarity of health benefits? Well, we've provided the legislative history on that. I mean, legislative history says there was a piece of litigation. There was litigation over this issue going into the area of age discrimination on this theory. And the court said, this is not age discrimination, because we're talking about retirement status, not about age status. But they did pass a statute saying you can't have any age discrimination with regard to retirees' health benefits. They said you can't have any age discrimination with regard to reducing benefits when there's Medicare. Right. So if they meant what you thought they meant, they should have said that. They didn't say that. Well, that's legislation by implication, which is disfavored. I'm sorry, I don't understand what you're saying. Well, we cited the Kelly case, which stands for the principle that when the legislature prohibits something in X area, it doesn't mean that they're permitting it in Y area. No, but it certainly doesn't support you either. Well, what does support us is that you've got no case in California law that says that this is unlawful. Well, that's fine. There's no case. This is the first one. But that doesn't help us with the answer either. But you've also got a bunch of statutes that say this is okay to have different. Where's that? Oh, you mean the non-FEHA statutes? Right. Any one that's applicable to these people? Sure. The OCEA statute under the government code, there was a challenge that said that was premised first as a vested rights challenge and then moved on to a statutory challenge under the government code, which said that agencies that provide retiree medical shall give preference to having plans that provide the same benefits that actives have. And the Court of Appeals said that doesn't mean they have to be equal. That's what? I'm sorry? The Court of Appeals said that does not mean they have to be equal. Okay. But there's nothing that says that they – that wasn't addressing age discrimination. The closest case we have is Doyle v. City of Medford, where the court said they don't have to be equal in an age discrimination context. Which case? I'm sorry? Doyle v. City of Medford. Okay. Which was affirmed by the Ninth Circuit on different grounds, I understand. So you've got all these instances where the legislature has – But I'd rather talk about the underlying issues rather than looking around for cases that are not presidential and aren't binding on us. So let's try and figure out what, in fact, the law is here. The one thing we do have is we have Hazen in the Kentucky case. Right. With regard to the recognition that, as I understand it, discriminating or treating retirees differently is not necessarily age discrimination, but it can be age discrimination. Is that basically where they leave us? I think that's a correct reading, Your Honor. Okay. So where's the line? Well, I think if you – actually, I'm not sure where that line is. I really am not. I think if you – I was trying to come up with instances before the argument where I could come up with a very clear-cut example where somebody said, let's say that you're at age 40 and you're employed. And we say, once you hit the age of 40, you're getting older and more expensive. We're going to cut you off. And you're employed, clearly. I think that would violate the Fair Employment and Housing Act. But here you've got something based on a whole different set of circumstances, which is retirement status. So that's an example where I think we cross the line. But it appears that they were treating people this way not because they were retired, because they already had made the decision to not treat retirees differently just because they were retirees. In other words, as we were saying before, it seems pretty obvious they could say, look, you're not working. You're not getting health benefits. Period, the end. But that isn't what they said then or now. Right? So instead, it is quite clear, as I understand it, or at least it's alleged to be quite clear, that the reason they split the roles was because the retirees were, on the average, older, not because they were making some determination that retirees should get less money because they're retired. Well, I mean, and this is where you get into this gotcha game of using the word age, which the California Supreme Court said, which is retired employees as a group are, on average, older and more expensive to insure. So somebody said, oh, my God, they said retirees are more expensive, and they're older, and they're therefore more expensive, and therefore, hey, this is age discrimination. But essentially, you're saying is that knowing the consequences of your acts, i.e. age, cannot be an inference of intent. You clearly have to be saying that, right? Right. I mean, right, given the statutory framework. But how do you deal with Manhart then? Well, I think, again, I think Judge Berzon, I mean, distinguished the case relative to the difference. Well, I hate that word distinguish. I mean, yeah, you can distinguish anything. But I want to know why it's different in a way that matters, not just different. Well, I've struggled with that because they have this, if you insert the word age in place of gender or race, you know, it sounds like a no-brainer. And yet you've got, you have to come back to what the legislature is prohibiting, and you have to come back to what we're talking about, which is retirement status. And the fact is that, as you said, Judge Murphy, in terms of the inferences that you can draw from the outcome of what you do. But actually, it wasn't a question of inferences from ramifications. In other words, they didn't start, if they had started out by saying, look, you know, we've now decided that retirees aren't working, and they should get less health benefits than active employees. And now that we've made that decision, look, it's going to save us a lot of money because, actually, they're older and sick. But that, so now we know the consequences, but we decided to do it on a different basis. But that's not what happened here. So I understand what happened here. The reason they decided to do it was to save money because they were older and sicker. Is that not true? That is not true. I think you have to look at the agenda report as to why they did it. And they did it because they wanted to. Well, it's not a fair inference, which at least would require a trial. Let's put it that way. It is not a fair inference that would require a trial. Why not? They did it because you look, the Ninth Circuit looks to what a legislative body does. They look primarily to legislation, and they look to the staff report and accompanying legislative committee reports and legislative records as to why they did what they did. And they said, here's why they did what they did. They said, number one, we want a sustainable plan. That was number one. And they're cheaper. In other words, they did get, it was a motivating factor that they were more expensive. I think that there's no question that there was a cost factor involved because they wanted to make the plan sustainable. And why were they more expensive? Well, I think we, I was reading from the Supreme Court. Retired employees as a group, this is what the Supreme Court said, are on average older and more expensive. That's what the Supreme Court said. Okay. So? So you come back to legislative intent. But women as a group live longer. I've struggled with that distinction. I struggle with the distinction. All I can say is you come back to what the state legislature said. Is all of this sub silencio you're saying that we value as more fundamental protections against discrimination on the basis of sex and race, more so than we do on discrimination on the basis of age, to the extent is that the former are protected constitutionally and the latter is protected only statutorily. Isn't that underneath what you're saying and trying to tell me how to distinguish manhood? I would have to think about that. I don't know that I can disagree with that, the way that you phrased it. I would agree, however, that in terms of the statutory prohibitions, again, you go to the state legislature. What does the state legislature prohibit? You keep saying that, but then give me something to stand on at that point. Why don't we know? It's basically what you're going to is these other provisions outside of FEMA. Is that what you're going to? Yes. That's basically what I'm going to. Okay. So that you think is the key point. That is a point in terms of you cannot conclude that the state legislature intended to prohibit what happened here by virtue of the fact that you've impacted a group of retirees negatively because there's no legislative exception that's out there. Because when these cases have come up and there is that issue raised, the legislature has legislated an exception. The bridge benefit issue is one issue. And again, I would look towards the government code section under OCEA, the same OCEA case where the court said you don't have to have equal benefits for a whole host of reasons. Very complex. Do those separate statutory provisions you're referring to, I mean, there's a whole group of them. Right. Do any of them address the hypothetical I've raised and that is, and Judge Berzon has raised, and that is you can deny all health benefits to retirees and not run afoul of the age discrimination case statute. I'm not sure if those statutory schemes say that, but I know, I'm very confident that employers can choose not to provide retired medical benefits to their retired employees. They can make that policy choice. And that's what's so important about, I think. How do you write, say you're the beneficiary of persuading the author of this case, how does the author write this so that it's not a proxy for age discrimination? Well, I think that you start with what the board said it wanted to do, which was to continue to provide quality, affordable group health coverage to its retirees. That was the initial. You're just moving the same thing a couple steps back. We haven't finished the sentence, all right? And therefore, they're going to pay less to the retirees because the retirees are older and sicker and they cost more. And therefore, although it was on the table simply to eliminate retiree health coverage, they chose not to. I mean, when this thing came to light, that's on the table. And remember, the legislative history that we've provided to the court with respect to the bridge benefit legislation, that's what the legislature looked at. It's like we don't want to disincentivize employers to provide retiree medical coverage. That's a good thing. And so you would say, look, the facts as alleged. That doesn't answer anything because it doesn't answer whether that would be a problem, too. I mean, one's instinct is it shouldn't be, but it still doesn't answer it conceptually. Anyway, we've talked for a very long time. I've been out of time for a while. Thank you for indulging me. Thank you. Thank you. Thank you. Going back to Judge Murphy's point about or question about sub saliencio and do we value preventing gender discrimination more than age discrimination, it's an interesting question, but it's not one for the courts to decide. It's a profound question. And that is a question for the legislature. Well, if you discriminated on the basis of these retirees, we're going to say you had a workforce that was predominated by African-American people and you had some statistics that said they cost you more for health care than other people. And so you're just going to cut them out because your active workforce is less African-American. But at least African-Americans can go to another statute. I mean, they can go to 1983, so you hurt me. But the age people can't. They're stuck with the age statute. Could you briefly comment on how you what the as I understand it, the employer thinks that a strongest argument is the other the other statutes, the non fee has statutes. Can you comment on those statutes, which and the prior Orange County case? How does that tie into this? It does not. The government code statute that was at issue in the OCA case has nothing to do with discrimination. The question was whether a statute that said, well, what does the statute say? The statute said counties shall prefer plans that include retirees and active employees at the same cost. That was not about discrimination. That was a policy decision that we went against discrimination, essentially. Yes. And then the litigation was whether prefer meant that they were absolutely required to choose the plan that gave equal benefits. And the court said, no, this statute, the word preferred does not mean required. So there is no statute that says it's fine to do this. That it's fine to. It's fine to have a split. With regard to discrimination. Okay. Thank you. Could I just very briefly say the MOUs do not refer to the plan document that purports to eliminate vesting. The MOUs, I believe, refer to the word plan. It says we will establish a plan. Now, an employee reading that MOU would not think, oh, this must mean a secret document the county has stuck in a drawer somewhere. I better go read it. The MOUs doesn't refer explicitly to this plan document. And the county does not pay 1%. It's a matter of semantics. The county gave a 1% raise at the same time. And I think that's different than saying the county pays the 1% every year. Because once you give a raise one year, that sort of gets caught up in collective bargaining. And the next year it kind of becomes very squishy to sort of say the county is still paying the 1%. I mean, employees saw a 1% deduction from their paychecks. So it wasn't coming from the county. It was coming from the employee. Is there anything in any of these medical plans that ties in with Medicare? Someone retires? You know what I'm talking about. The county's had a Medicare coordination. And that is explicitly sanctioned. It is now. It is because it was a while ago under the ADEA. California relatively recently said we better get a similar provision just in case. And in that process of doing that, the legislature said FEHA protects retirees. FEHA protects retirees' health benefits. It's in the legislative history that we produced on the record. So what's the conclusion that we draw from that? That in a case like ours, these benefits are protected under FEHA. The fact that discrimination takes place after retirement does not remove the protection. The relationship is still an employment relationship even after retirement. The relationship of an employer paying a former employee retirement benefit is an employment relationship. It's not for many purposes. For example, under the NLRA and state bargaining statutes, it's not. I understand. I'm sorry. For purposes of a discrimination statute, the idea that an employer could the day after retirement say, I don't like to pay African Americans retirement benefits, that's absurd. Right. Anyway, this is a fascinating case, and thank you both. Thank you very much. Thank you.
judges: Pregerson, Murphy, Berzon